**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

PAUL SCHERMICK,

      Petitioner,

v.                                       Case No. 8:13-cv-1985-T-36TBM

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

      Petitioner Paul Schermick, an inmate in the Florida Department of Corrections, filed

through counsel a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1) and

memorandum of law (Dkt. 2).  He challenges his conviction entered by the Circuit Court for

the Twelfth Judicial Circuit, Sarasota County, in 2008.  Respondent filed a response (Dkt.

10), which raises no challenge to the timeliness of Schermick's petition. Schermick filed a

reply (Dkt. 13).  Upon review, Schermick's petition must be denied.

### PROCEDURAL HISTORY

      A jury convicted Schermick of one count of lewd or lascivious molestation by a

person over 18 years of age upon a child less than 12 years of age.  (Dkt. 12, Ex. 1, pp. 17-

18, 69.)  Schermick was sentenced to twenty-five years in prison, followed by lifetime sex

offender probation. (Dkt. 12, Ex. 1, pp. 103-105, 111-117.)  The state appellate court *per

curiam* affirmed Schermick's conviction and sentence.  (Dkt. 12, Ex. 5.)  His motion for

rehearing was denied.  (Dkt. 12, Exs. 6, 7.)  Schermick filed a motion for postconviction

relief under Florida Rule of Criminal Procedure 3.850, which the state court summarily denied.  (Dkt. 12, Exs. 9, 15.)  The state appellate court *per curiam* affirmed the order of denial.  (Dkt. 12, Ex. 19.)

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied,* 531 U.S. 840 (2000).  Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).  Section 2254(d), which sets forth a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a

federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *Accora Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster,* _U.S._, 131 S. Ct. 1388, 1398 (2011) ("This is a

'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

In a *per curiam* decision without a written opinion, the state appellate court affirmed the rejection of Schermick's postconviction motion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court. *Pinholster,* 131 S. Ct. at 1398. Schermick bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel are analyzed under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test

> for analyzing ineffective assistance of counsel claims.   According to
> *Strickland*, first, the defendant must show that counsel's performance was
> deficient.   This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the defendant by
> the Sixth Amendment.   Second, the defendant must show that the deficient
> performance prejudiced the defense.   This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).   In order to show deficient performance, a petitioner must demonstrate that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance."   *Strickland*, 466 U.S. at 690.   However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.*  Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Schermick must demonstrate that counsel's alleged errors prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691-92.   To show prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

 A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done.  Nor
> is the test even what most good lawyers would have done.  We ask only

> whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105 (citations omitted).  *See also Pinholster*, 131 S. Ct. at 1410 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

If a claim of ineffective assistance of counsel can be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered.  466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

## DISCUSSION

**Ground One**: "MR. SCHERMICK WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO MOVE TO HAVE THE ALLEGED VICTIM'S CHILD HEARSAY STATEMENTS EXCLUDED FROM TRIAL."

The female child victim, S.V., was friends with Schermick's daughter, T.S. Schermick was charged with lewd or lascivious molestation for touching S.V. during a sleepover at Schermick's house.  S.V., who was ten years old when the offense occurred, testified at trial.  The State also introduced S.V.'s statements about the offense through the testimony of her friend, child witness N.T., and through a recording of a Child Protection Team (CPT)[1] interview of S.V.

Schermick argues that counsel was ineffective for not challenging the introduction of S.V.'s hearsay statements.  At a pre-trial hearing, counsel stated that he determined the statements' reliability was not an issue and stipulated to their reliability.  (Dkt. 12, Ex. 1G, pp. 7-8, 17-18.)  S.V. also made statements about the offense to her mother and to N.T.'s mother; counsel's main concern was that the introduction of these statements through testimony of the children's mothers would be cumulative.  (*Id.*)  But counsel informed the court that he believed he and the prosecutor could agree the children's mothers would only testify to the sequence of events surrounding S.V.'s disclosure. (*Id.*)

The record does not show that the trial court made any findings about the reliability or admissibility of S.V.'s hearsay statements following counsel's stipulation. The statements were admitted at trial through the testimony of N.T. and the recorded CPT interview.  N.T., who was eleven years old when she testified at trial, testified about S.V.'s disclosure of the offense:

Q.    Was there ever a time where [T.S.] was planning to have a pool

---

[1] This interview was part of law enforcement's investigation of the offense.  Trial testimony reflects that the Sarasota County Sheriff's Office relies on the Child Protection Center to conduct forensic interviews of children younger than twelve years old.  (Dkt. 12, Ex. 1B, pp. 310-12.)

party?

A.    Yes.

Q.    Did you ever talk to [S.V.] about going to that pool party?

A.    Yes.

Q.    And was [S.V.] excited about going to the pool party?

A.    No.

Q.    What was the pool party going to be for?

A.    It was just a little get-together with our friends.

Q.    Okay.  And why wasn't [S.V.] excited about the pool party?

A.    She told me something happened over there and she was really scared to go over.

. . .

Q.    Did you ask [S.V.] about what had happened over there?

A.    Yes.

. . .

Q.    Okay.  And what did she tell you?

A.    She said that one day when she spent the night at [T.S.'s] house, that during like the night, Paul came in there and touched her down there.

Q.    Down there?

A.    Yes.

Q.    Is that the phrase that she used?

A.    Yes.

(Dkt. 12, Ex. IA, pp. 203-05.)

Counsel did not object to this testimony.  (*Id.*)  Additionally, a recording of the CPT

interview was published.  This included the following:

|  |  |
|---|---|
| [CPT]: | Okay.  Now, tell me, is it better to tell the truth or better to tell a lie? |
| [S.V.]: | Better to tell the truth. |
| [CPT]: | Okay.  What happens if you tell a lie? |
| [S.V.]: | Then nothing is going to get fixed and you're going to get in trouble. |
| [CPT]: | Okay.  And what happens when you get in trouble? |
| [S.V.]: | You get grounded or punished. |
| [CPT]: | Okay.  Anything else? |
| [S.V.]: | I don't know.  I've never really told a lie. |
| [CPT]: | Okay. Okay.  Well, another rule that we have in here . . . is we need to talk about true things.  Things that really happened.  Okay? |
| [S.V.]: | Okay. |

. . .

|  |  |
|---|---|
| [CPT]: | Okay. So tell me, who brought you here today? |
| [S.V.]: | My mom and dad. |
| [CPT]: | Okay.  And what did they say you would be doing here? |
| [S.V.]: | Telling what happened at my friend's sleepover. |
| [CPT]: | Okay.  And who is your friend? |
| [S.V.]: | (Inaudible) when I spent the night at her house. |
| [CPT]:: | Uh-huh. |
| [S.V.]: | Her dad went to sleep before us. |
| [CPT]: | Okay. |

[S.V.]:        And then when we fell asleep, he came in and started flipping me around and touching me on my private.

. . .

[CPT]:         Okay.  All right.  So where did this happen?

[S.V.]:        At her house.

[CPT]:         Okay.  Were you in her room or somewhere else?

[S.V.]:        We were in her bedroom.

[CPT]:         In her bedroom.  Okay.  And you said that her dad - - what is his name?

[S.V.]:        Paul Schermick.

[CPT]:         Okay.  Her dad fell asleep before you?

[S.V.]:        Yeah.

. . .

[CPT]:         Okay.  Do you remember what you were wearing?

[S.V.]:        I was just wearing a shirt.

[CPT]:         Okay.  Did you have anything on underneath your shirt?

[S.V.]:        It was just a shirt and my underwear.

[CPT]:         Okay.  Okay.  And so when he came in (inaudible) I wasn't there.  And help me understand what happened.  When he (inaudible) what did he do first?

[S.V.]:        He just like took a flashlight and came in and just touched my private.

[CPT]:         Okay.  Was it on top of your clothes, underneath your clothes, or something else?

[S.V.]:        It was on top of my clothes.

[CPT]:         On top of your clothes?  Okay. [T.S.], was she awake?  Did

|            |                                                                                           |
|------------|-------------------------------------------------------------------------------------------|
|            | she see anything?                                                                         |
| [S.V.]:    | No.  She was asleep the whole time.                                                       |

. . .

| [CPT]:  | Okay.  Okay.  And had that ever happened before with him? |
|---------|-----------------------------------------------------------|
| [S.V.]: | Well, he drinks all the time, so it hadn't ever happened before when I slept at their house, but I don't like going around him because he kind of freaks me out. |
| [CPT]:  | Really? |
| [S.V.]: | Yeah. |
| [CPT]:  | Okay.  What do you mean, he drinks? |
| [S.V.]: | I don't know what he drinks. |
| [CPT]:  | Okay. |
| [S.V.]: | But I know he drinks. |
| [CPT]:  | Like alcohol or - - |
| [S.V.]: | Yeah. |
| [CPT]:  | Okay.  Okay.  Have you seen him drink alcohol? |
| [S.V.]: | Yes. |
| [CPT]:  | Okay.  So that night that you spent the night and he touched your private, did you see him drinking any alcohol, or something else? |
| [S.V.]: | That night, yeah. |
| [CPT]:  | You did?  What did you see? |
| [S.V.]: | I just saw like a can of something. |

. . .

| [CPT]: | Oh, okay.  Okay.  And did you tell anybody? |
|--------|---------------------------------------------|

[S.V.]:        No.  I told this other girlfriend.  Or my other friend.

[CPT]:         Uh-huh.

[S.V.]:        Her mom.

[CPT]:         Uh-huh.

[S.V.]:        And then she stopped by yesterday and told my mom.  And then I told
               my mom.  Then she called the cops.

. . .

[CPT]:         Okay.  All right.  How did that feel when he touched this part of your body with his finger?

[S.V.]:        I don't remember.

(Dkt. 12, Ex. 1A, pp. 263-69; Dkt. 12, Ex. 1B, p. 276.)  The interviewer also asked S.V. to

circle on diagrams the part of her body where Schermick touched her, as well as the part

of his body he used to do so.  (Dkt. 12, Ex. 1A, pp. 270-72.)  S.V. further recounted the

events, and recalled that Schermick wore gray pajamas.  (Dkt. 12, Ex. 1B, p. 277.)  At the

end of the interview, she was asked:

[CPT]:         [ ] Now, tell me, did anyone tell you what to say in here today?

[S.V.]:        No.

[CPT]:         No?  Okay.  And did we talk about true things, things that really happened?

[S.V.]:        Uh-huh.

(*Id.*, p. 279.)  Counsel stated he had no objection to the introduction of the recording. (Dkt.

12, Ex. 1A, pp. 250-51.)

S.V. also testified, telling the jury that during the night, Schermick twice came into

T.S.'s room.  S.V. testified that the first time, Schermick moved her from her side to her

back and rubbed her thigh.  (Dkt. 12, Ex. 1B, pp. 289-90.)  She told him to stop and he left.

(*Id.*, pp. 290-91.)  S.V. testified that Schermick returned later, flipped her over again, and

touched her "private."  (*Id.*, p. 291.)  S.V. testified that her clothes were on and Schermick

used his hand and "rubbed."  (*Id.*, pp. 291-92.)  When she told him to stop, he left the room.

(*Id.*, p. 292.)  S.V. testified that she was scared and did not want to tell anyone about the

events.  (*Id.*, pp. 292-93.)  She told N.T. because it was bothering her and she "really

trust[ed]" N.T.  (*Id.*, p. 293.)

In his postconviction motion, Schermick raised the same claim of ineffective

assistance of counsel that he presents in the federal habeas petition, alleging counsel was

ineffective for not challenging the introduction of S.V.'s hearsay statements through the

testimony of N.T. and the CPT tape.[2]  The state court entered a detailed order rejecting

Schermick's claim of ineffective assistance of trial counsel:

## Analysis

### I.  Defense counsel exercised reasonable trial strategy

Citing Defendant's trial counsel's statements during a pre-trial hearing, including a statement indicating that "normally, Judge, what we would be doing in those things is discussing the reliability of the circumstances in which it occurred.  I'm not actually contesting that.  I've been through that in other cases.  I know that that's not the issue.  My issue is an issue that's brought up in a lot of these cases, which is the cumulative nature of the testimony" – the State contends that the Defendant's trial counsel exercised sound trial strategy by not contesting the reliability of the child hearsay statements and instead focusing on the cumulative nature of four hearsay statements, which potentially could have been introduced at trial.  The Court agrees with the State's conclusion.

---

[2] A petitioner must exhaust his constitutional claims in state court before federal habeas relief can be granted.  28 U.S.C. § 2254(b)(1).  Respondent raises no challenge to Schermick's petition based on lack of exhaustion, and a review of the record shows that the claim was exhausted in state postconviction proceedings.

The Florida Supreme Court has "explained that, regarding deficiency, 'strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.'" Usually, a trial court's finding that defense counsel made a tactical decision in advising the defendant is inappropriate without an evidentiary hearing, but where, as here, the record adequately shows that defense counsel considered and rejected the strategy of contesting the reliability of the child hearsay statements, no evidentiary hearing is required.  In addition to the previously quoted statement, during the same pre-trial hearing, defense counsel indicated, "I've taken the depositions of the witnesses.  I've read all the case law.  There's no question that the circumstances, you know, the circumstance, it passes all of those tests.  So I'm not going to be objecting to any of that."  He also stated, "I've seen the CPT numerous times.  There's no obvious issues there. . . . There's no question that the circumstances are reliable."  Rather, Defendant's trial counsel focused on trying to reduce the cumulative nature of four hearsay statements that could have been introduced against him and, as the State points out, succeeded in the sense that the State only introduced the substance of two of the potential four statements.  The Court finds that, under the circumstances of this case, Defendant's trial counsel's strategy was reasonable.

II.     <u>Defendant fails to establish prejudice.</u>

Assuming *arguendo*, however, that the Defendant's trial counsel was deficient in failing to properly object to the admission of the two recordings, the Court also examines whether such failure prejudiced the Defendant at trial.  To establish *Strickland* prejudice, the Defendant must show that, had his attorney objected, there is a reasonable probability that the result of his trial would have been different.

The Court finds that even if the Defendant's attorney had moved the Court to make the findings required by section 90.803(23), the Court could have done so.  Thus, the question remaining is whether the Court could reasonably have made findings that would have rendered the child hearsay statements admissible.  The Court finds that it could reasonably have made the following findings, which would have rendered the complained of child hearsay statements admissible.

A.     <u>Court's Findings Regarding Admissibility of Victim's Declarations</u>

The relevant portion of section 90.803(23) reads:

**Hearsay exception; statement of child victim.- -**

(a) Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical . . . age of 11 or less describing . . . any act of sexual abuse against a child . . . or any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any . . . criminal proceeding if:

1. The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. . . . .

. . . .

(c) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this subsection.

§ 90.803(23), Fla. Stat. (2004).

. . .

1.   Source of information

A statement is inadmissible if "the source of information or the method or circumstances by which the statement [was] reported indicates a lack of trustworthiness." Here, the first child hearsay statement as presented by the victim's friend [N.T.], raises no issues of trustworthiness. As the State points out in its Response, [N.T.] was 11 years old at the time of Defendant's trial, but her deposition and trial testimonies indicate an articulate and competent child who testified under oath consistently and intelligently.

Likewise, the second child hearsay statement was an audio recording of the victim's initial interview with the Child Protection Team, and the "source of information" regarding that statement was the recording itself, which raises no issues of trustworthiness. Also, the "method and circumstances by which the statement was reported" was through an audio recording, and there was no evidence of tampering with the recording itself. Thus, the Court finds that for both the victim's disclosure to [N.T.] and her recorded CPT statement, neither the source of information nor the method or circumstances by which the statement was reported indicates a lack of trustworthiness.

2.   Factors regarding reliability

For each child hearsay statement to be admissible, the Court must

find "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability."  In determining this, the Court may consider several facts, such as

(1)    the reliability of the child victim;
      (a)    the child's mental and physical age and maturity;
      (b)    the child's ability to distinguish between reality and fantasy;
      (c)    the child's mental state when the abuse was reported;
(2)    the reliability of the assertion;
      (a)    the relationship of the child to the offender;
      (b)    the nature and duration of the abuse or offense;
      (c)    the amount of time between the abuse and the statement;
      (d)    the vagueness of the accusations;
      (e)    contradictions within the accusation;
      (f)    whether the child described the act in a childlike way or used terminology unexpected of a child of similar age;
      (g)    the child's motive or lack thereof to fabricate the statement;
      (h)    the possibility of any improper influence on the child by participants involved in a domestic dispute;
      (I)    whether the child made independent reports of abuse to multiple people;
      (j)    whether the child was still emotionally affected by the abuse;
      (k)    the spontaneity of the statement;
            (I)    whether the child made the statement at the first available opportunity following the alleged incident;
            (ii)    whether the child made the statement in response to questions from adults.

These factors are helpful guideposts in the Court's "totality of the circumstances evaluation."  Also, making this evaluation, the Court must not consider other evidence that corroborates the child's statement.

Several factors weigh heavily in favor of finding the child hearsay statements reliable.  First, with regard to the child hearsay statement introduced through the victim's friend [N.T.], although some time had passed since the alleged abuse occurred, the timing of the victim's disclosure to [N.T.] during a conversation about whether she would be attending an upcoming pool party at Defendant's house and her lingering fear over returning to the Defendant's house show that the victim was still emotionally affected by the abuse when she made her disclosure to [N.T.].

Second, with regard to the child hearsay statement introduced through

a recorded CPT interview, the victim showed that she understood the difference between the truth and a lie, and she agreed to tell the truth.  In interviewing the victim, the CPT interviewer asked primarily open-ended questions and avoided putting words in the victim's mouth.  Significantly, the victim corrected the interviewer on certain details.  In general, the interviewer appears to have followed her training and gently coaxed out the child's own story.

Last, and perhaps most significant for this inquiry, is the content of the victim's statements.  She told when and where the alleged act of abuse occurred.  She mentioned what clothing she and Defendant wore and that he carried a flashlight.  Her description is of a kind that is unlikely to result from anything but personal experience and observation, not a child's imagination or conjuring.  Further, she related the alleged incident in a childlike way, using words that would be expected of a child of similar age, not medical terminology.  Finally, the victim's story was consistent throughout the two statements, and there is no indication that either the victim or [N.T.] had motive to fabricate the accusation.  Nor is there any evidence that the victim's statements were improperly influenced by some other party.

Based on the above findings, the Court could reasonably have admitted the victim's recorded statements under section 90.803(23).  Therefore, even if the Defendant's attorney had objected under 90.803(23) and moved the Court to make the required findings, the attorney's motion most likely would not have changed the result of the trial.  Accordingly, the Defendant was not prejudiced, and his argument on this ground fails.

(Dkt. 1, pp. 23-30; Dkt. 12, Ex. 15, pp. 4-11) (court's footnotes omitted).

Schermick does not demonstrate that the state court made an objectively unreasonable determination when it found counsel was not ineffective.  First, Schermick fails to show deficient conduct by counsel for not challenging the statements.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.  Thus, counsel's "decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)).

Schermick asserts that counsel's decision not to challenge the reliability of the statements could not have been a reasonable strategic decision because he did not explain why he concluded that S.V.'s hearsay statements were reliable.  However, as the state court's order discussed, counsel made clear to the court at the pre-trial hearing that he considered the question of reliability before deciding not to challenge the statements on this basis because there was "no question" as to their reliability.  (Dkt. 12, Ex. 1G, pp. 7-8, 17-18.)  Counsel instead focused on limiting the number of times the jury heard S.V.'s statements about Schermick's conduct by preventing the introduction of this information through testimony of N.T. and S.V.'s mothers.  (*Id.*)  Given this, Schermick fails to establish that counsel's decision fell outside the range of reasonable strategic decisions.  Accordingly, he does not demonstrate that the state court's conclusion was an unreasonable application of *Strickland*.

Second, Schermick fails to demonstrate any prejudice as a result of counsel's choices.  The state court concluded that a challenge to S.V.'s statements would have been denied, as the trial court could have found them to be admissible under state law.  Preliminarily, Schermick's ineffective assistance of counsel claim involves the application of § 90.803(23), Fla. Stat., Florida's hearsay exception for statements of children with respect to sexual abuse.  This Court must defer to the state court's determinations regarding the application of Florida law.  "[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  *See also Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the

claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'") (citing *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)).

In addition, the record supports the conclusions reached by the state court in finding that Schermick suffered no prejudice.  The state court found that S.V.'s statements entered through the testimony of N.T. indicated trustworthiness because N.T. was an articulate and competent witness.   A review of N.T.'s trial testimony supports the court's conclusion that she was an able witness. The state court also found these statements were reliable for numerous reasons, all of which are supported by the record.   Specifically, the record supports the state court's conclusions that although S.V.'s disclosure was not immediate, it was made upon discussing a return to Schermick's house; that S.V.'s description of events was consistent with personal experience and observation and was made in a childlike manner; that S.V. provided consistent statements about the event; and there was no evidence she was improperly influenced or that she or N.T. had a motive to lie.

Schermick argues, however, that S.V.'s hearsay statements introduced through N.T.'s testimony were unreliable because N.T. was also a child.   (Dkt. 2, pp. 7-8.) Therefore, he questions whether N.T. understood the significance of her testimony, that she was required to be truthful, or the potential effect of providing untruthful testimony.  (*Id.*) These generalized arguments are too vague and speculative to warrant relief.  *See Hill v. Lockhart*, 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

In further support of his claim that the statements to N.T. were unreliable, Schermick argues that N.T.'s testimony left open certain questions:

> How long after the alleged incident took place did the alleged victim make these statements to the child witness?  What were the precise words used by the alleged victim and were those words or phrases one would expect a child, and more specifically, the child in this case to use?  What specifically prompted the alleged victim to make the statements in question to the child witness?

(Dkt. 2, pp. 7-8.)  But the record shows that these concerns were addressed at trial.  First, S.V.'s disclosure to N.T. was less than two weeks after the incident.[3]  Second, N.T. testified that S.V. said Schermick touched S.V. "down there"; when the prosecutor asked whether this was the phrase that S.V. used, N.T. said that it was. (Dkt. 12, Ex. 1A, pp. 204-05.)  Schermick offers no evidence or argument to suggest the term "down there" would not have been expected of a ten-year-old child, or S.V. in particular.  Third, N.T. explained that S.V. made the statements when their conversation turned to T.S.'s upcoming pool party, as S.V. was scared about returning to the Schermick house.  (*Id.*, pp. 203-05.)  Accordingly, Schermick fails to demonstrate that he was prejudiced by counsel's failure to raise the proposed challenges to S.V.'s statements introduced through N.T.'s testimony.

Nor does Schermick establish that he suffered prejudice as a result of counsel failing to object to S.V.'s statements introduced through the recorded CPT interview.  The state court found that the statements were trustworthy because they were recorded, and there

---

[3] S.V.'s mother recalled that the sleepover was on June 10 or 11, 2007, and the charging document alleges that the offense occurred on or about June 11, 2007.  (Dkt. 12, Ex. 1, p. 17; Ex. 1A, p. 230.)  S.V. initially disclosed the offense to N.T. and, a short time later, to N.T.'s mother.  N.T.'s mother told S.V.'s mother about the disclosure the next day.  (Dkt. 12, Ex. 1A, p. 215.)  S.V.'s mother testified during the April 2008 trial that she recalled N.T.'s mother informing her of S.V.'s disclosure on approximately June 20 or June 22 "of last year." (*Id.*, pp. 226-27.)  Law enforcement was dispatched on June 22.  (*Id.*, p. 247.)  When S.V.'s mother was asked whether she took S.V. for an interview the same day, she recalled that they went to Child Protection Services the next morning.  (*Id.*, p. 229.)

was no indication of tampering with the recording.  The record contains no evidence that the recording was compromised.  Additionally, the record supports the findings the state court made in concluding that these hearsay statements were reliable.  S.V.'s statements to the CPT interviewer reflect that she understood the difference between the truth and a lie and stated she would tell the truth.  As with the first hearsay statement, the record also supports the state court's determinations that S.V.'s description was childlike and appeared to rest on personal observation, that her statements about the incident were consistent, and there is no evidence she had an incentive to lie or that her statements were influenced.

However, Schermick argues that S.V.'s statements to the CPT interviewer were unreliable.  In support, he asserts that the interview was days after the incident; it was possible that S.V.'s statements were fabricated and influenced by her parents, who told her she would be talking about what happened; her remark during the interview that Schermick "drinks all the time" was not a childlike comment; and S.V. stated she did not remember how it felt when Schermick touched her.  (Dkt. 2, pp. 8-9.)

These assertions, which are not substantiated with any evidence, cannot support a conclusion that counsel was ineffective.  S.V. stated during the interview that no one told her what to say and that she talked about true events that actually happened.  (Dkt. 12, Ex. 1b, p. 279.)  There is no evidence that her parents, or anyone else, shaped her statements or told her what to say.  Nor is there any evidence that the passage of time between the offense and the interview affected the reliability of S.V.'s statements.  And while Schermick argues S.V.'s comment that he "drinks all the time" is not something a child would say without having heard it from an adult, S.V. testified to seeing Schermick drink alcohol.  (Dkt. 12, Ex. 1A, pp. 267-68.)  Further, although S.V. answered, "I don't remember" when asked

how it felt when she was touched, Schermick does not establish that this answer means her repeated, consistent statements about the events were not reliable.   In sum, Schermick's assertions are speculative and unsubstantiated.   Consequently, they cannot sustain a finding that counsel was ineffective.  *See Hill*, 474 U.S. 52; *Tejada*, 941 F.2d at 1559.

Schermick also argues that the statements were unreliable because the CPT interviewer led S.V. into giving certain answers.  (Dkt. 2, pp. 8-9.)  In support, he cites the following portions of the trial transcript reflecting the CPT interview of S.V.:

> CPT:   Okay.  All right. And just so I understand.  You were at [T.S.'s].  And you were in her room.  And you were asleep.  And you awoke to a flashlight?
>
> S.V.:   Yeah.

(Dkt. 12, Ex. 1A, p. 272.)

> CPT:   Okay.  And he touched (inaudible) part of your body with his finger on top of your clothes?
>
> S.V.:   Yes.

(*Id.*, p. 273.)

> CPT:   Okay.  And then he left.  And then you went back to sleep. And then he came back in?
>
> S.V.:   Yes.

(*Id.*, p. 273.)

> CPT:   Okay.  Okay.  So then he took the - - you were under the covers and then he took the covers off?
>
> S.V.:   Yes.

(Dkt. 12, Ex. 1B, p. 276.)

CPT:  Okay.  Okay.  And that you were laying on your side and he kept putting you on your back?

S.V.:  Yes.

(*Id.*)  Schermick's argument is unavailing.  A reading of the interview transcript in its entirety shows that before these questions were asked, S.V. had already provided the relevant information through more open-ended questioning.  (Dkt. 12, Ex. 1A, pp. 264, 265-66, 268, 271, 272; Dkt. 12, Ex. 1B, pp. 275-76.)  With respect to the question about Schermick touching her with his finger, S.V. had already been asked to circle on a diagram the part of his body he used to touch her, and had also stated that he used his finger.  (Dkt. 12, Ex. 1A, p. 272.)  Accordingly, Schermick  fails to show that S.V.'s statements were unreliable on the basis that the CPT interviewer may have led her to provide certain answers through the questions he identifies.

The record therefore supports the state court's finding that even if counsel challenged the hearsay statements and moved the court to make findings under § 90.803(23), Fla. Stat., there is no reasonable probability that the outcome of the proceeding would have been different.  Accordingly, Schermick does not show prejudice as a result of counsel's failure to challenge the reliability of S.V.'s hearsay statements introduced at trial through the testimony of N.T. and through the recorded CPT interview.  Because he does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim of ineffective assistance of counsel, Schermick is not entitled to relief on Ground One.

Schermick argues that the state court erred in not conducting an evidentiary hearing on his postconviction claim.  This assertion cannot provide federal habeas relief, as it raises

no challenge to the validity of Schermick's conviction.  *See Carroll v. Sec'y DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) ("[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment–*i.e.,* the conviction itself–and thus habeas relief is not an appropriate remedy."); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief.")

Finally, Schermick seeks an evidentiary hearing on his federal habeas petition. However, the Court concludes that an evidentiary hearing is not necessary.  *See Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

Accordingly, the Court **ORDERS** that Schermick's petition (Dkt. 1) is **DENIED**.  The Clerk is directed to enter judgment against Schermick and to close this case.

It is further **ORDERED** that Schermick is not entitled to a certificate of appealability. A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition.  28 U.S.C. § 2253(c)(1).  A district court must first issue a certificate of appealability (COA).  *Id.*  "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* at § 2253(c)(2).  To make such a showing, Schermick "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S.

274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-Eℓ v. Cockreℓℓ*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).   Schermick has not made this showing.   Finally, because Schermick is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on August 12, 2016.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel for Petitioner
Counsel for Respondent